# Staunton.

## FAYETTE NATIONAL BANK v. SUMMERS.

### September 13, 1906.

1. BANKS AND BANKING—*Title to Checks Deposited—Suit by Bank—Equities.*—Whether a bank receiving from a customer a check endorsed by him, which it places to his credit, becomes the owner of the check or a mere agent for collection, depends upon the intention of the parties; but ordinarily a check so deposited is taken for collection by the bank as the agent of the depositor, and although the bank, as a matter of favor or convenience, may permit the depositor to draw against the check so deposited before payment— the depositor in the event of non-payment being responsible for the sums drawn—the bank does not thereby become a *bona fide* endorsee of the check, and in a suit by it on the check, the drawer may set up any equities he may have against the endorser.

2. SALES—*Action for Price—False Representations—Damages—Set-Off.* Where, in an action on a check given for the entire purchase price of a horse, it appears that the defendant was induced to purchase the horse by certain representations which prove to be false, he is entitled to set-off against the check damages sustained by reason of the false representation; but if such damages do not go to the full amount of the check the plaintiff may recover whatever may be due on the check after deducting such offset.

Error to a judgment of the Circuit Court of Pulaski county, in an action of assumpsit. Judgment for defendant. Plaintiff assigns error.

*Reversed.*

The opinion states the case.

*T. L. Massie,* for plaintiff in error.

*J. C. Wysor,* for defendant in error.

Keith, P., delivered the opinion of the court.

Upon the trial of an action of assumpsit brought by the Fayette National Bank against C. G. Summers, there was a verdict and judgment for the defendant, and the case is before us upon a writ of error allowed by one of the judges of this court.

The plaintiff, to maintain the issues at the trial, introduced a check drawn on the Pulaski National Bank by C. G. Summers, to the order of John T. Hughes, for $500.00, dated October 26, 1903. This check was endorsed by Hughes to the Fayette National Bank, and when presented for payment was duly protested. It appears that this check was given to Hughes for the purchase price of a horse. Summers was engaged in the business of breeding saddle horses, and went to Kentucky to purchase a stallion. There he met with John T. Hughes, who lived at Lexington, and told him that he wished the horse for breeding purposes, and wanted a horse that carried a high, straight tail, as he wished to breed it for his own use and profit, and that a horse carrying a low, crooked tail was not good for breeding purposes, as that quality would be transmitted to its offspring. Hughes showed Summers a horse four years of age, stated that it was a thoroughbred, but had not been registered, that it was sound and carried a high, straight tail. Summers drove and rode the horse, and had it ridden and driven for him, examined it carefully and noticed a small scar under the horse's tail and called Hughes' attention to it. Hughes stated that he had not noticed it before, but that he knew it had not been cut for the purpose of straightening the tail, as he had raised the horse.

After bringing the horse home, Summers discovered that in

driving him he would carry his tail well and straight for a time, but upon becoming fatigued he would hold it to one side. There was no other fault found with the horse than the one mentioned.

Having discovered this defect, Summers determined not to pay the check, and instructed the bank to protest it when presented for payment, and then wrote Hughes that the horse had been misrepresented to him; that he did not carry a high, straight tail; and that he did not want it, as it was valueless to him for breeding purposes. Having notified Hughes that the horse did not suit him, and that he would not pay the check, he turned it out in the pasture, where the horse broke one of its legs and was killed. Upon examination of its tail after death, evidence was found that an operation had been performed upon its tail, leaving a scar, to which Summers had called the attention of Hughes.

On the part of the bank it was shown that Hughes endorsed the check to the Fayette National Bank, which placed the proceeds to his credit; that upon receiving notice of the protest of the check the bank, without the knowledge of Hughes, charged the check back to him. As soon as Hughes was made aware of this fact he protested against this being done, and insisted that there was no liability upon him with respect to the check, except as endorser upon it, and that the bank must proceed to make the money out of the drawer of the check. Thereupon the bank did as directed, credited Hughes with the amount of the check, and instituted this suit.

There is no evidence that the bank had any knowledge whatever of any equities or set-offs existing between Hughes and Summers when it, in the first instance, passed the amount of the check to the credit of Hughes.

Both plaintiff and defendant asked for instructions, all of

which were refused by the court, which then proceeded to instruct the jury as follows:

"The court instructs the jury that if they shall believe from the evidence that the plaintiff bank received the check which is the ————— of this suit as a deposit to be treated as cash, and that such was the intention of the parties (Hughes and the bank) at the time the check was received and deposited, then title to said check passed to the bank at that time. But if the jury shall believe from the evidence that the parties intended that the bank should not receive said check as cash, but only as an agent for collection, then title to said check did not vest in the bank at the time of the deposit.

"The court further tells the jury the question as to whether the parties intended the check when deposited to be treated as cash or merely for collection is one of fact for the jury under all the facts and circumstances proven in the case relating thereto and throwing light thereon.

"If the jury shall believe from the evidence that the parties (Hughes and the bank), at the time the check was received and deposited, intended that the same should be treated as cash, then the plaintiff is entitled to recover in this action, unless they further believe from the evidence that at the time of the deposit the plaintiff had notice of the matters affecting Hughes' right to recover on said check, if any.

"But if the jury shall believe from the evidence that the check was intended by the parties to be deposited merely for collection, then the plaintiff cannot claim to be a purchaser for value and without notice of the matters affecting the consideration of the check; but if the jury shall believe that after said check was protested the bank purchased the check, it is entitled to recover whatever amount of said check, if any, the jury may find due after allowing any offsets, if any they may

---

---

find due under the evidence, on account of the matters alleged in defendant's special plea."

We are of opinion that these instructions correctly apply the law to the facts of the case.

"Checks deposited and credited do not become the property of the bank, even though the depositor has been allowed to check against the deposit before the paper is collected, and the depositor can recover the check or other paper." Morse on Banks (4th ed.), sec. 586.

In *National Bank* v. *Miller,* 77 Ala. 173, 54 Am. Rep. 50, it is said: "When a check is deposited it is taken generally for collection by the bank as the agent of the depositor, and the bank does not owe the amount until its collection is accomplished. It may be that, if it is passed to the credit of the depositor and mingled with the general funds of the bank, it is *prima facie* a payment of deposit; but the bank may permit, as a matter of favor and convenience, checks to be *drawn against it before payment—the depositor in the event of non-payment being responsible for the sums drawn*—not by reason of his endorsement, the check not having ceased to be his property, but for money paid."

Conceding that there was a false representation upon which the defendant was entitled to a set-off against the check, it still appears that the horse was of considerable value for other than breeding purposes; in other words, that the damages sustained by reason of the false representation did not go to the full amount of the check, which represented the entire value of the horse. The defendant, Summers, admits that the horse was worth $125.00, and there was other evidence tending to prove that it was of even greater value. The verdict of the jury, which denied the right of the plaintiff to recover anything,

ought to have been set aside by the trial court as contrary to the evidence.

For these reasons its judgment must be reversed and a new trial awarded.

*Reversed.*